UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MERRIMACK MUTUAL FIRE INSURANCE COMPANY, a/s/o Michael Subklew,<br>    *Plaintiff*,<br>    *v.*<br>WATKINS MANUFACTURING COMPANY and JJD INCORPORATED d/b/a GREGORIO POOLS a/k/a GREGORIO POOLS, SPAS AND SKIS,<br>    *Defendants*. | Civil No. 3:13cv123 (JBA)<br><br>May 26, 2015 |

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is a products liability suit arising out of a fire at the home of Michael Subklew, whose real and personal property were insured by Plaintiff Merrimack Mutual Fire Insurance Company ("Merrimack"). Merrimack brings this action as subrogee of Mr. Subklew against Defendants Watkins Manufacturing Company ("Watkins") and JJD Incorporated (d/b/a Gregorio Pools) ("Gregorio")[1], the manufacturer and retailer, respectively, of a hot tub purchased by Mr. Subklew which Merrimack claims caused the fire. Plaintiff alleges [Doc. # 29] that Defendants are liable under theories of strict liability, failure to warn, failure to test, breach of warranty, and negligence, but the crux of all of Plaintiff's claims is that the hot tub was defectively designed and this defect caused the fire. Defendant Watkins moves [Doc. # 58] for summary judgment, arguing that although Plaintiff's case relies on expert testimony, it has failed to disclose testimony by qualified experts using reliable methods sufficient to satisfy Plaintiff's burden of proving a

---

[1] JJD Inc. has not appeared to defend this action.

design defect. Oral argument was held on April 17, 2015. For the reasons that follow, Watkins's motion for summary judgment is granted.

I. **Background**

On January 30, 2012, at about 1 p.m., a fire began at the home of Michael Subklew in North Canaan, Connecticut, which continued until the early morning hours of January 31, 2012. (Marino Report, Ex. 3 to Watkins's Loc. R. 56(a)1 Stmt [Doc. # 58-2] at 1.) Investigators from the Connecticut Department of Public Safety were unable to determine the cause of the fire, but they concluded that it was "more probable than not" that the fire was caused by "an electrical malfunction" in Mr. Subklew's hot tub, located on the southwest corner of a wooden deck attached to the rear of his house. (*Id*. at 12.)

Mr. Subklew had purchased the hot tub, which was designed and manufactured by Watkins, from Gregorio in Torrington, Connecticut around August 29, 2004. (1st Am. Compl. ¶¶ 12, 14.) About a year later, Gregorio installed the tub on Mr. Subklew's deck. (Subklew Dep., Ex. 4 to Watkins's 56(a)1 at 21.) Mr. Subklew stated in his deposition that until the fire, "[t]he hot tub worked very well," and he could recall only one occasion, a year or two before the fire, when the tub needed repairs. (*Id*. at 35.) After the fire, Mr. Subklew submitted a claim to his insurer, Merrimack Mutual, for the damage to his real and personal property caused by the fire, for which he received "an amount in excess of $75,000." (1st Am. Compl. ¶ 15.) Merrimack has hired four experts to investigate the cause of the fire: Trooper Michael Marino of the Connecticut State Police, Bill Lewis, a fire cause and origin investigator, Joseph Cristino, an electrical engineer, and

2

Dr. Richard Kaae, an expert on rodents and rodent control.  Their findings are detailed below.[2]

### A.  Michael Marino

Mr. Marino, a trooper in the Connecticut State Police's Fire and Explosion Investigation Unit, headed up the police investigation of the fire, along with Detective DeSousa, the North Canaan Fire Marshal Daryl Byrne, and two North Canaan Deputy Fire Marshals, M. Fitting and Robin Denny.  (Marino Report at 1.)  Mr. Marino's Investigation Report, dated June 12, 2012, describes their investigation of the scene of the fire and their conclusions about the cause of the fire.  (*See generally id.*)  According to the report, investigators began by determining in what area the fire had originated.  (*See id.* at 2–5.)  Based on observations by the first responders, the location of the heaviest fire damage, and burn patterns, investigators were able to determine that the fire originated in the southwest corner of the exterior wooden deck, where a hot tub had been located.  (*Id.* at 2, 6, 11.)

Next, they sought to identify the ignition source of the fire.  (*Id.* at 5.)  By examining weather reports and visually observing the damage sustained by various potential sources, they were able to rule out as potential ignition sources: lightning, a wood pellet stove, the fire place, an electrical receptacle in the living room, an outdoor light and switch located in the wooden convertible changing room, and an electrical service panel and electrical circuit breakers.  (*Id.* at 3, 5, 7, 10–11.)  They were not able to rule out the hot tub, which was "observed to have incurred fire damage mainly to the

---

[2] This section omits statements made by the experts in their affidavits for the reasons set out in Section A of the Discussion below.

south side . . . where the motor, temperature controls and electrical connections were located." (*Id.* at 11.) Mr. Subklew reported to the investigators that he always kept the hot tub on and running, and that "[r]ecently he heard a humming noise coming from the electrical panel" and when "[h]e opened the panel," he observed that the "noise was coming from the hot tub circuit breaker." (*Id.* at 7.) "With all [other] possible ignition sources eliminated, the investigative team concluded that [although] th[e] [cause of the] fire is UNDETERMINED in nature [it was] more probable than not [that the fire was] caused by an electrical malfunction of the hot tub motor and/or temperature control device." (*Id.* at 12.)

### B.  Bill Lewis

Mr. Lewis, a certified fire inspector retained by Merrimack to investigate the origin and cause of the fire, has investigated over 1,000 fire cases in his career, served as a fire marshal, deputy fire marshal, company chief, and fire chief, and testified as an expert witness in fifteen cases. (Lewis C.V., Ex. B to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 60].) Based on his experience, his review of the site of the fire, Mr. Marino's report, and information from Mr. Subklew, Mr. Lewis concluded, like Mr. Marino, that the "fire originated in the area of the hot tub's main control panel" "on the southwest corner of the deck." (Lewis Report, Ex. 6 to Watkins's 56a(1) at 2.) After identifying the area of origin of the fire, he began to rule out possible causes of the fire. (*Id.* at 1.) He noticed "a string of lights against the house," but eliminated it as a possible cause; he also eliminated the electrical system and "all other building services and any other ignition sources . . . except for the hot tub." (*Id.* at 2.) After learning from Mr. Subklew that "a circuit breaker on the panel that supplied electricity to the hot tub" had been "making a humming noise" and

4

getting "very hot," he "recommended that an Electrical Engineer . . . examine the hot tub." (*Id.*)  Thereafter, "X-ray analysis, microscopic analysis, and visual analysis" of the hot tub was conducted, revealing acorns "along the lower part of the hot tub in the area of a caution label," which Mr. Lewis believed to be "indicative of rodents getting into the hot tub." (*Id.*)  Mr. Lewis concluded that "the fire started in the hot tub" but he also noted that "[m]uch of [the hot tub's] control panel was destroyed by the . . . fire." (*Id.*)

**C. Joseph Cristino**

Mr. Cristino, an electrical engineer who has been qualified to testify as an expert witness in seventeen cases has also been retained by Merrimack. (*See* Cristino C.V., Ex. C to Pl.'s 56(a)2.)  Mr. Cristino worked for the Connecticut Light and Power Company for thirteen years before forming Cristino Associates, which performs forensic investigations to determine electrical causation, among other work. (*Id.*)

Mr. Cristino visited Mr. Subklew's house to investigate the cause of the fire on February 13, 2012, conducted a follow-up examination on February 20, 2012, and performed laboratory examinations of the hot tub on January 21 and 22, 2013. (Cristino Report, Ex. 8 to Watkins's 56(a)1 at 1, 3.)  During the course of his investigation, he observed that "[d]amage to the Hot Tub was most severe in the area where the control would have been located; the control panel was destroyed by the fire;" "[t]he Hot Tub's interior wiring exhibited signs of electrical fault activity;" "[t]he building wiring that supplied the Hot Tub was intact up to and through the point of entry into the Hot Tub assembly;" "[t]he Hot Tub's internal wiring was found to be segmented and exhibited signs of electrical activity;" and "[n]ut husks and bedding material found within the Hot

Tub assembly exhibited signs of fire/heat exposure, indicating their presence within the Hot Tub prior to or at the time of the January [30–]31, 2012, fire." (*Id.* at 2–3.)

Although Mr. Cristino concluded that both "[t]he electrical wiring within the [house]" and "[e]lectrical building wiring within the area of the deck upon which the Hot Tub was located" "could be ruled out as having produced a competent electrical ignition source" and that the "fire was [likely] the result of an electrical ignition source within the subject Hot Tub," he was unable to identify "an exact component or wiring failure" because "[d]estruction to the electrical wiring within the Hot Tub was extensive and prevented any identification of an exact component or wiring failure." (*Id.* at 3.) Mr. Cristino did state, however, that "while an exact failure location and failure mechanism cannot be identified, the indications of electrical faults and fragmentation of internal wiring provide irrefutable verification that the Hot Tub provided a competent ignition source for the . . . fire." (*Id.* at 4.) Further, "[t]he indications of the presence of varmints within the Hot Tub only add another probable failure mechanism; that being the unabated ingress of varmints into the Hot Tub and exposing the internal wiring to varmint attack." (*Id.*)

### D.  Richard Kaae

Merrimack's last expert witness, Dr. Richard Kaae, earned a Ph.D. in Pest Management – Entomology from the University of California, Riverside, and has been a professor of Pest Management, Entomology, and Pest Biology and Control since 1972, as well as the owner and operator of Pesteducation.com since 2004. (Kaae Resume, Ex. G to Pl.'s 56(a)2 at 1.) In addition, he owned and operated a rodent control company from 1979 to 1998. (*Id.*)

6

Dr. Kaae observed that "[t]he workings inside a hot tub would . . . provide an ideal area for a rat or mouse to establish a nest," particularly "in the . . . cooler months due to the protective nature of the internal workings of a spa, including warmth." (Kaae Report, Ex. G to Pl.'s 56(a)2 at 1.) He added that it is common for rodents to "chew on" electrical wires or "collect matches to store in their nests" and "there are many reported instances where this has resulted in fires," as rodent nests are "typically made of shredded [paper or wood]" which "enhance[s] the chances of a fire starting from an electrical spark or ignited match." (*Id.*) "Rodents have extremely hard incisor teeth and are capable of gnawing through many hard materials." (*Id.*) Dr. Kaae reported that "in order to prevent against the dangers of mice or rats nesting in a hot tub, a manufacturer needs to install a mesh or screen with holes sized less than ¼ inch wide, . . . made from [sufficiently hard] material" to prevent rodents from chewing through it. (*Id.* at 2.)

## II.     Discussion[3]

Plaintiff's claims are governed by the Connecticut Product Liability Act ("CPLA"), which establishes liability for "all claims or actions brought for personal injury, death or

---

[3] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

property damage" caused by an allegedly defective product, whether they arise from "the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of [the] product." Conn. Gen. Stat. § 52-572m(b).

To prevail on a design defect claim under the CPLA, "a plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." *Metro. Prop. & Cas. Ins. Co. v. Deere & Co.*, 302 Conn. 123, 131 (2011) (internal quotation marks omitted). "For a product to be unreasonably dangerous, it must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* (internal quotation marks omitted). This standard does not require plaintiffs to prove "the existence of a reasonable alternative design in order to prevail on a design defect claim." *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 215 (1997).

Watkins puts forth three theories for why summary judgment should enter against Merrimack. First, Watkins asserts that Plaintiff's proffered expert testimony is insufficient as a matter of law to satisfy its burden of proof under the CPLA. Next, it claims that even if Plaintiff's experts were prepared to offer sufficient testimony to

establish a design defect, they are not qualified to so testify. Finally, Watkins alleges that Plaintiffs' experts' testimony is not based on reliable methodology and data.[4]

## A. Expert Affidavits

As an initial matter, Watkins urges the Court to disregard Merrimack's experts' affidavits because Merrimack did not disclose these affidavits to Watkins during discovery as required by Federal Rule of Civil Procedure 26(a)(2)(B). Under the Rule, each party must disclose "the identity of any witness it may use at trial to present evidence," and, when the witness is an expert specially retained to provide expert testimony, "this disclosure must be accompanied by a written report" containing, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). These disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). A party may supplement its disclosures of expert reports "if the party learns that in some material respect the disclosure or response is incomplete or incorrect," but "[a]ny additions or changes . . . must be disclosed by the time the party's pretrial disclosures . . . are due." Fed. R. Civ. P. 26(e).

In this case, the Court ordered Plaintiff's expert disclosures to be completed by December 1, 2013 and subsequently granted Plaintiff's motion for an extension of time until December 15, 2013. (*See* Order [Doc. # 35] Granting Motion for Extension of Time.) Plaintiff timely submitted the reports of its experts, but now, nearly a year later

---

[4] Because the Court finds that Plaintiff's expert testimony is insufficient as a matter of law to satisfy its burden of proof under the CPLA, the Court does not reach Watkins's second and third arguments.

seeks for the first time, as part of its opposition to Watkins's motion for summary, to submit affidavits of three of its experts (Cristino, Lewis, and Kaae) taken in October 2014. This is a violation of Federal Rules of Civil Procedure 26(a)(2)(D) and 26(e), for which Plaintiff offers no explanation or justification.

Federal Rule of Civil Procedure 37(c) provides that where, as here, "a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." There is no evidence that Plaintiff's violation of the rules was substantially justified, and it does not appear to have been harmless. Each of the affidavits makes substantive additions or changes to the expert's initial report which Watkins may have wished to explore during its depositions had it been privy to the information at an earlier date.

Mr. Cristino's affidavit, for example: (1) describes, presumably for the purpose of bolstering his qualifications, several occasions on which he investigated fires or electrical incidents caused by rodents (Cristino Aff. ¶¶ 5–7); (2) adds details about Mr. Cristino's methodology, presumably in response to Watkins's objections regarding the reliability of Plaintiff's expert testimony (*id.* ¶¶ 11, 14–16); and (3) adds the definitive conclusion that "the fire was the result of an electrical short circuit" that "occurred somewhere between the hot tub's interface to where the incoming power was routed to the spa in an area of wiring that was energized" and "it is highly probable that a rodent infestation . . . caused the short circuit"[5] (*id.* ¶ 18–20).

---

[5] By comparison, Mr. Cristino's report states only the "fire was the result of an electrical ignition source within the subject Hot Tub spa" and "[t]he indications of the

Dr. Kaae's affidavit likewise appears tailored to address Watkins's objections. After noting that rodents have sharp enough teeth to bite through aluminum, Dr. Kaae shifts from stating in his report that aluminum is used "in some spa screens to prevent rodent access" (Kaae Report at 2) to asserting in his affidavit that the particular hot tub at issue here used aluminum (Kaae Aff. ¶ 19). This shift enabled Dr. Kaae to conclude in his affidavit, for the first time, that "[b]ecause the subject hot tub did not have [an adequate] mesh or screen on it to prevent the ingress of rodents, it is my opinion that the hot tub has a defective design." (*Id.* ¶ 21.) Finally, Mr. Lewis's affidavit adds detail to his methodology, laying out a step by step procedure that is absent from his report (Lewis Aff. ¶¶ 8–9), and supplements his report by adding his observations that "[a] mouse carcass was found in the remains of the hot tub" and that the screen at the hot tub's air vent was made of aluminum (*id.* ¶ 11).

Because Plaintiff's failure to abide by Rule 26(a) and (e) was neither substantially justified nor harmless, the Court will exclude Plaintiff's expert affidavits from its analysis of Watkins's motion, pursuant to Rule 37(c). *See A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F. Supp. 2d 33, 39 (D. Conn. 2007) ("[P]laintiff having never sought an extension of the expert report deadline, having served its expert report more than eight months late and after the filing of the pending Motions for Summary Judgment, and articulating no good cause for the delay, the Court GRANTS the Motions to Strike Dancyger's Report. . . . Plaintiff's unjustified and untimely interposition of the Dancyger

---

presence of varmints within the Hot Tub only add another probable failure mechanism; that being the unabated ingress of varmints into the Hot Tub and exposing the internal wiring to varmint attack." (Cristino Report at 3–4.)

11

Report is antithetical to efficient case management; to hold otherwise would be to render scheduling orders irrelevant.").

B. **Sufficiency of the Evidence**

Defendant contends that "Merrimack can only establish its prima facie case under the [CPLA] by offering expert testimony . . . that there was a defect in the hot tub," as the inner workings of a hot tub are "beyond the field of ordinary knowledge and experience of judges and juries."[6] (Mem. Supp. Mot. Summ. J. [Doc. # 58-1] at 6.) Because "the experts designated by Merrimack have not disclosed opinions sufficient to satisfy plaintiff's burden of proving a design defect," Defendant argues that Plaintiff's claim fails as a matter of law. (*Id.* at 7.) The Court agrees.

As clarified at oral argument, Plaintiff asserts two separate and distinct theories of liability, a traditional design defect theory and a malfunction theory. Each is discussed below.

1. **Design Defect Theory**

Plaintiff alleges that the hot tub design was unreasonably dangerous in that it failed to prevent rodents from accessing the control panel and causing a fire. There are, however, two problems with this theory.

First, none of Plaintiff's experts has identified a specific unreasonably dangerous defect in the hot tub. Mr. Cristino wrote in his report that one "probable failure mechanism" was "the unabated ingress of varmints into the Hot Tub" (Cristino Report at 4), but in his deposition, he admitted that he had "no idea" if there were any rodents

---

[6] Plaintiff does not appear to contest this claim. (*See* Pl.'s Opp'n to Mot. for Summ. J. [Doc. # 60] at 11.)

actually living in the hot tub at the time of the fire (Cristino Dep. at 60), or, if there were, how they might have entered the tub (*id.* at 92–93).  Further, Mr. Cristino acknowledged that he is not qualified to offer an opinion as to whether a product properly protects against the ingress of rodents or wildlife.  (*Id.* at 21.)

Dr. Kaae observed that Watkins's instructions manual advises consumers to cover access points to the spa's "equipment compartment with a heavy gauge screen material," but he opined that "[i]t would be more useful if the recommendation indicated the mesh of the screen and material used in the screen" and that "it would seem that the spa company would include installed rodent-proof screens over possible rodent access points into the tub."  (Kaae Report at 1–2.)  He offered no opinion, however, as to whether Watkins's hot tub design was unreasonably dangerous.  Further, while Dr. Kaae noted that "[t]he material of which the screens are composed" is important because rodents can chew through some material including "aluminum, a material that is used in some spa screens to prevent rodent access" (*id.* at 2), his report does not state that Watkins's hot tub utilized aluminum, and if so, whether the use of aluminum created an unreasonably dangerous condition.

Mr. Marino's report concludes that the cause of the fire was "undetermined," but was likely "caused by an electrical malfunction of the hot tub motor and/or temperature control device."  (Marino Report at 12.)  Mr. Marino offered no opinion as to what caused the malfunction and whether it was caused by a design defect.  Mr. Lewis likewise determined that the fire originated in the hot tub's main control panel but failed to identify any specific malfunction or defect.  (*See* Lewis Report at 2.)  In sum, none of

13

Plaintiff's experts has identified a specific defect in the hot tub or opined that such defect was unreasonably dangerous to support a traditional design defect claim.

Plaintiff's traditional design defect claim also fails for another reason: even assuming *arguendo* that Plaintiff could establish that the hot tub was defectively designed, Plaintiff has not adduced sufficient evidence to show that the defect caused the fire. In Mr. Cristino's report, he stated that although he could conclude that the "fire was the result of an electrical ignition source within the subject Hot Tub spa," "an exact failure location and failure mechanism cannot be identified." (Cristino Report at 3–4.) He testified that "it appears [there] was an outside source of failure in the form of [an] . . . attack on the wiring, . . . most probably [by] varmints," but he admitted that due to "the extent of the damage," he could not find any evidence of "rodent impact on any of the wiring in the hot tub." (Cristino Dep. at 91–92.) In fact, although nut husks were found within the tub, he could not say for sure whether there were any rodents living in the hot tub at the time of the fire. (*Id.* at 60, 90.)

Dr. Kaae testified that "[a]corns and nesting material were reported in the control panel of the burnt hot tub" and that "there are many reported instances" in which "rodents chew[ing] or gnaw[ing] on . . . electrical wires" "has resulted in fires," but he stopped short of opining that this fire was caused by rodents. (Kaae Report at 1.) Mr. Marino concluded that the fire was caused by an "electrical malfunction" but he offered no opinion as to the source of that malfunction. (Marino Report at 12.) Mr. Lewis agreed that the fire began in the hot tub, and he noted that the acorns found in the hot tub were "indicative of rodents getting into the hot tub," but he offered no conclusion as to whether rodents were likely the source of the fire. (Lewis Report at 2.) In sum, Plaintiff

14

has put forth no evidence to support its claim that the fire was caused by a design defect in the hot tub, and summary judgment is properly granted on this claim.

### 2. Malfunction Theory

Plaintiff additionally advances a malfunction theory. "[B]ased on the same principles underlying the doctrine of res ipsa loquitor," the malfunction theory "permits a jury to infer that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect" "if the plaintiff presents evidence establishing that (1) the incident that caused the plaintiff's harm was of a kind that ordinarily does not occur in the absence of a product defect, and (2) any defect most likely existed at the time the product left the manufacturer's or seller's control and was not the result of other reasonably possible causes not attributable to the manufacturer or seller." *Metro. Prop. & Cas. Ins. Co.,* 302 Conn. at 134, 139–40. "A plaintiff may establish these elements through the use of various forms of circumstantial evidence, including evidence of (1) the history and use of the particular product, (2) the manner in which the product malfunctioned, (3) similar malfunctions in similar products that may negate the possibility of other causes, (4) the age of the product in relation to its life expectancy, and (5) the most likely causes of the malfunction." *Id.* at 140–41. "If lay witnesses and common experience are not sufficient to remove the case from the realm of speculation, the plaintiff will need to present expert testimony to establish a prima facie case." *Id.* at 141.

As explained at oral argument, Plaintiff's malfunction theory is that properly maintained hot tubs do not ordinarily burst into flames and that the hot tub's wiring had not been altered since it was installed.

15

### a. Element One: The Incident that Caused the Harm was of a Kind that Ordinarily does not Occur in the Absence of a Product Defect

"Evidence supporting the first element permits the trier of fact to infer that the plaintiff's injury resulted from a defect in the product rather than from some other cause of the accident, such as operator error." *Id.* Plaintiff has provided sufficient evidence to satisfy this prong.

Plaintiff's experts' uncontradicted opinions are that the fire was, more likely than not, caused by a short circuit in the hot tub's electrical wiring "in the area of the hot tub's main control panel" (Lewis Report at 2; *see* Cristino Dep. at 61 ("Based on our observations in the laboratory exam, it is highly probable that the ignition source for this fire was an electrical short circuit.")), and was not caused by any potential ignition source outside the hot tub (*see generally* Marino Report, Cristino Report, Lewis Report).

Mr. Subklew stated that: the hot tub received regular maintenance (Lewis Report at 2); he followed the instructions in the hot tub's manual (Subklew Dep. at 39); he never took the siding off the hot tub or inspected any of the electrical wiring in the hot tub (*id.* at 46); and in the six and a half years he owned the tub, he had only one occasion to service the hot tub—a year or two before the fire, when the heater stopped working and Gregorio had to come repair it (*id.* at 35, 38, 39). On the basis of this evidence, together with the common knowledge that hot tubs, "in normal use, do not self-ignite," *Metro. Prop. & Cas. Ins. Co.*, 302 Conn. at 141 (quoting *Liberty Mut. Ins. Co. v. Sears, Roebuck & Co.*, 35 Conn. Supp. 687, 691 (Super. Ct. 1979)), a reasonable jury could conclude that the harm here was of a kind that ordinarily does not occur in the absence of a product defect. Thus, the first element of a malfunction claim is satisfied.

### b. Element Two: Defect Most Likely Existed When Product Left the Manufacturer's Control

"Evidence as to the second element supports an inference that the defect in the product existed when the product left the manufacturer's control and was not introduced by any other reasonably possible cause outside of its control . . . such as the age of the product, abuse or improper maintenance." *Id*. at 142–43. In other words, the plaintiff "must present sufficient evidence to negate a reasonable possibility that something or someone besides the manufacturer caused the defect in the product." *Id*. at 143.

Plaintiff has not met that burden on this record. Although Plaintiff presented evidence from which a reasonable jury could determine that the fire was caused by a short circuit in the hot tub, it offered no evidence to negate the possibility that the short circuit was caused by something or someone other than the manufacturer.

For example, Gregorio replaced the heater in the hot tub[7] "a year or two before the fire" (Cristino Dep. at 71; Subklew Dep. at 38), but Plaintiff offers no evidence demonstrating that in replacing the heater, Gregorio did not do anything to cause a short circuit. Defendant's expert noted that "the remains of the extension cords found in the southwest corner of the deck showed localized damage consistent with electrical fault activity on the female buss connections of one of the cords" (Hoffman and Wallace Report, Ex. F to Pl.'s 56(a)2), and Plaintiff does not explain why the short circuit could not have been caused by a problem in the extension cord. Mr. Subklew told Mr. Marino that the hot tub "is always on and running," that it was last used about a month before the

---

[7] At oral argument, the parties stated that the motor not the heater was replaced, although the record is silent on this point.

fire, and that he did not recall lowering the temperature after using it. (Marino Report at 12.) Plaintiff offers no evidence with respect to whether this practice was unrelated to the short circuit. Finally, and importantly, the hot tub was six and a half years old without prior incident at the time of the fire (*see* Invoice dated August 29, 2004, Ex. 5 to Watkins's 56(a)1), but Plaintiff does not adduce any evidence to show that ordinary wear and tear did not contribute to the short circuit, *see Metro. Prop. & Cas. Ins. Co.*, 302 Conn. at 147 ("If a product is not new or nearly new when it allegedly malfunctioned, and the product functioned without problems indicative of a defect before the malfunction, the plaintiff must present some evidence to explain how the product could have operated without incident for a time and then have failed on this particular occasion.").

"In the absence of such evidence, any link between the product failure and a defect attributable to the manufacturer is simply too attenuated to serve to establish liability on the part of the manufacture." *Id.* Plaintiff's claim under the malfunction theory thus fails as a matter of law.

### III.   Conclusion

For the foregoing reasons, Defendant Watkins's Motion [Doc. # 58] for Summary Judgment is GRANTED.

IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of May, 2015.